UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| | |
|---|---|
| JOHN YUNCKES,<br><br>        Plaintiff,<br>v.<br><br>MICHAEL CHERTOFF, SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY,<br><br>        Defendant. | Civ. Action No. 05-5766 (KSH)<br><br><br><br><br><br><u>**OPINION**</u> |

**Katharine S. Hayden, U.S.D.J.**

**I. INTRODUCTION**

The Rehabilitation Act of 1973, 29 U.S.C. § 701, *et. seq.*, prohibits employment discrimination on the basis of disability and requires federal agencies to make reasonable accommodation to the known physical and mental limitations of qualified persons with disabilities. This matter finds *pro se* plaintiff John Yunckes ("Yunckes") seeking the protections of the Rehabilitation Act based on his allegations that his termination from employment with the Department of Homeland Security ("DHS") violated the Act.

**II. BACKGROUND**

On January 12, 2003, Yunckes began his employment, subject to a one-year probationary period, as an Immigration Inspector Trainee in the Newark District Office of

1

the Immigration and Naturalization Service ("INS").[1]  (Ex. Y to Bynon Decl.)  The position required him to pass a complete physical, which he did prior to January 12.  (Ex. E to Yunckes Decl.)  He was also required to successfully complete the Immigration Officer Basic Training Course by achieving passing scores in various subject areas, including physical techniques and firearms training, at the law enforcement academy located in Glynco, Georgia.  (Ex. Y.)  Yunckes entered the academy on February 5, 2003.  (Ex. Y.)  On February 11, 2003, he received specific notice that he would face termination from his employment with DHS if he did not achieve a score of 252 on his firearms qualifying exam.  (Ex. Y.)

Although he performed satisfactorily in other areas, Yunckes struggled during the firearms training, consistently receiving the lowest scores in his class.  (Ex. L to Bynon Decl.)  He scored a 182 on his March 19, 2003 qualifier and was referred to remedial training, which placed him in an intensive six-day class and allowed him two additional retests on March 26 and March 27.  (Ex. Y.)  He attended the remedial training from March 20 to March 27, 2003.  (Ex. Y.)  Yunckes contends that throughout much of his training, he had experienced difficulty kneeling, a movement required for approximately half of the gun range exercises.  (Yunckes Dep. 25.)  But it was not until March 27, the day of the second retest, that he sought medical attention, and did so only after injuring his right ankle, right hand, and right ear when he fell down a flight of stairs the day before.  (Ex. Q. Decl.)  Dr. Tom Willis diagnosed Yunckes with a ligamentous strain, recommended an over-the-counter painkiller, and filled out a memorandum form to the training instructors indicating that Yunckes was excused from any activities involving running or jumping.  (Ex. Q.)  Yunckes insists that he did not seek medical attention before March 27 because he did not

---

[1] On March 1, 2003, several federal agencies, including the INS, were consolidated into the new Department of Homeland Security.

2

want to be sent back to the Newark District Office to restart the placement and training process. (Yunckes Dep. 28.)

Yunckes failed both retests. (Ex. Y.) On March 28, 2003, the DHS issued a letter terminating his employment, citing his failure to achieve a passing score of 252 on his firearms training qualifier. (Ex. T to Bynon Decl.) The letter also noted that he had received, and acknowledged receiving, advance notice that failure to complete firearms training constituted grounds for termination. (Ex. T.) After his dismissal from the DHS, Yunckes sought diagnoses from several medical professionals. In late April of 2003, an MRI performed by AP Diagnostics revealed some herniation of his cervical and lumbar spine. (Ex. AA to Bynon Decl.) On July 1, 2003, Dr. Teresa Vega, as part of a physical for a U.S. Customs position, concluded that his "left knee [had] no effusion and he [had] full range of motion." (Ex. CC to Bynon Decl.) In October of 2003, Dr. Shawn Sieler diagnosed him with chronic cervical and lumbar sprain, and recommended a 10-pound lifting restriction. (Ex. Q to Yunckes Decl.) On November 12, 2003, Dr. David Tam concluded that Yunckes had suffered ligamentous strains of the knee and thumb as a result of the March 26 accident. (Ex. EE to Bynon Decl.) In December of 2004, Dr. David Weiss diagnosed Yunckes with multiple conditions, including post traumatic internal derangement to the right knee, bulging cervical discs, and chronic post traumatic right ankle sprain. (Ex. O to Yunckes Decl.) Dr. Joseph Lombardi examined Yunckes on several occasions starting on May 12, 2006, and has diagnosed him with arthritis of the right knee and degenerative disc disease, which is a gradual deterioration of the discs between the vertebrae. (Ex. AA.)

On December 14, 2005, Yunckes brought this action after exhausting his administrative appeals with the DHS and the Equal Employment Opportunity Commission

("EEOC"). (Ex. Y.) The DHS has moved for summary judgment, arguing that Yunckes has failed to establish a *prima facie* showing of discrimination and has not offered evidence that rebuts its legitimate, nondiscriminatory basis for the adverse employment decision.

### III. SUMMARY JUDGMENT STANDARD

On a motion for summary judgment the Court "must examine the record to see whether the [the moving party], in depositions, answers to interrogatories, admissions, affidavits and the like, has demonstrated 'the absence of a genuine issue of material fact' and his entitlement to judgment as a matter of law." Beard v. Banks, 126 S. Ct. 2572, 2578 (2006) (quoting Fed. R. Civ. P. 56). The Supreme Court has stated, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. At this stage, the Court "is required to view the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party." Imazio Nursery, Inc. v. Dania Greenhouses, 69 F.3d 1560, 1562 (Fed Cir. 1995).

### IV. DISCUSSION

The Rehabilitation Act provides for two distinct causes of action against federal employers and employers who receive federal funding: 1) disparate treatment of a disabled employee; and 2) failure to reasonably accommodate a disabled employee. See Shiring v. Runyon, 90 F.3d 827 (3d Cir. 1996). Yunckes' submissions make reference to both theories of recovery, and the Court will address both.

### A. Disparate Treatment

Because the various federal anti-discrimination statutes serve the same purpose, the Third Circuit has held that the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793-94, (1973), applies to discrimination claims brought under the federal anti-discrimination statutes, including the Rehabilitation Act.  Wishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007).  "Under the McDonnell Douglas burden shifting paradigm, plaintiff has the initial burden to make a *prima facie* showing of discrimination, but if s/he does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment action."  Id.  Once the employer provides a legitimate reason for the adverse employment action, the burden shifts back to the plaintiff to raise an issue of fact regarding whether the employer's proffered explanation is pretextual or whether discrimination was more likely than not a determinative factor in the decision.  Id.

To establish a *prima facie* case of disparate treatment disability discrimination in the context of placement and hiring, a plaintiff must prove by a preponderance of the evidence that: (1) he was disabled; (2) he was qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he was nonetheless terminated or otherwise prevented from performing the job.  Mengine v. Runyon, 114 F.3d 415, 418 (3d Cir. 1997).  Summary judgment is appropriate where a defendant demonstrates that the plaintiff is unable to establish a *prima facie* case of discrimination, or, if the plaintiff has established a *prima facie* case, that the plaintiff could not produce sufficient evidence of pretext to rebut an assertion of legitimate nondiscriminatory reasons for the adverse employment action.  Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989), cert. denied, 429 U.S. 1023 (1990).

5

Yunckes must prove by a preponderance of the evidence that he was disabled within the meaning of the Rehabilitation Act. No matter how painful or damaging the impairment at issue, the protections of the Act do not apply without this initial showing. "Under the Act, a disability is any impairment that substantially limits at least one major life activity." Greb v. Potter, 176 Fed Appx. 260, 262 (3d Cir. 2006) (citing Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002)). The Court's inquiry with regards to whether Yunckes was disabled is necessarily limited to the period of his employment with the DHS. Sever v. Henderson, 381 F. Supp. 2d 405, 414 (M.D.Pa. 2005) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999)). Yunckes must have been disabled within the meaning of the Act at the time of the alleged discriminatory act. Id. After reviewing the parties' submissions and the record, the Court concludes that Yunckes was not disabled within the meaning of the Act during the time he was employed by the DHS.

The Supreme Court has explained that an impairment satisfies the "substantially limits" requirement, which should be read strictly, where the impairment is permanent or long-term and prevents or severely restricts the employee from "doing activities that are of central importance to most people's daily lives." Toyota, 534 U.S. at 198. The inquiry is an individualized one, requiring plaintiffs to provide more than a simple medical diagnosis and instead offer evidence that "the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." Id.

Yunckes stated in his deposition that he began to experience difficulty kneeling and bending down during firearms training. (Yunckes Dep. 25.) Other than his difficulty kneeling during firearms training, he has made no other representations that he suffered limitations caused by his impairment during his time at the academy. To the contrary, he

6

notes in his submissions that he began his own personal daily training program, which consisted of pushups, sit-ups, side bends, and other exercises, during the time he was at the academy. (Pl. Opp'n to Mot. Summ. J. 3.) He also leaves unexplained how he passed a complete physical before his placement with the DHS if he suffered from a substantial physical impairment. These facts demonstrate that the limitation he experienced during his time at the academy was not substantial.

He urges that he is still entitled to the protections of the Rehabilitation Act because he has experienced increasingly more severe limitations since his termination from employment with the DHS. Dr. Lombardi has diagnosed him with degenerative disc disease and arthritis in his knee, and he contends that it has become increasingly difficult for him to drive for long periods of time and that he does not have the mobility necessary to play with his grandchildren. (Pl. Opp'n to Mot. Summ. J. 14.) Leaving aside the issue of whether any of the limitations he has put forth actually constitute a "major life activity," his assertions on this point fail to carry his burden of proof, because the Court may only consider the limitations stemming from the impairment at the time of the alleged discriminatory act. His subsequent impairment, no matter how substantial, does not provide a basis to invoke the protections of the Rehabilitation Act for an alleged discriminatory act that occurred years before that subsequent impairment.

Yunckes also relies on medical diagnoses to establish that he was disabled within the meaning of the Act; however, established law confines this Court's inquiry to whether "the extent of the limitation [caused by his impairment] in terms of his own experience . . . [was] substantial." Toyota, 534 U.S. at 198. Nonetheless, the contemporaneous diagnoses provide reliable evidence from which the Court can infer the extent of the impairment at

7

the time of the alleged discriminatory act.  On March 27, 2003, Dr. Willis examined Yunckes and determined that he suffered from a ligamentous strain.  More importantly, Dr. Willis only recommended that Yunckes be excused from activities involving running or jumping for a period of a week.  Although the April 2003 MRI revealed herniations, Yunckes' representations with regards to his daily exercise program show that those herniations did not substantially limit his mobility during his training.  And in July 2003, Dr. Vega found that his "left knee [had] no effusion and he [had] full range of motion."  Then in November of that same year, Dr. Tam made the determination that Yunckes had suffered a ligamentous strain from the March 26 accident, the same diagnosis provided by Dr. Willis at the time of the accident.  Yunckes points to several other doctor visits as proof of the severity of his impairment; however, none of those diagnoses were contemporaneous to his time at the academy, with some occurring years after his termination.  (Pl. Opp'n to Mot. Summ. J. 11.)  The Court does not doubt the sincerity of Yunckes' contentions regarding the impairment he now suffers or the reliability of the more recent diagnoses, but the extent of the limitation caused by his impairment now cannot be the basis for a discriminatory act then.

Even if the record demonstrated that Yunckes could establish a *prima facie* showing of discrimination at trial, summary judgment would still be appropriate.  Under the McDonnell Douglas burden shifting framework, the burden would then shift to the DHS to articulate some legitimate, nondiscriminatory reason for the employment action.  The DHS maintains that it could carry that burden, and the Court agrees.  The record includes clear documentary evidence that Yunckes had actual notice of the firearms requirement and that he performed poorly from the very start of his firearms training.  The March 28, 2003 letter

informing him of dismissal from the DHS was clear in citing his failure to achieve a passing score of 252 on his firearms training qualifier as the reason for the adverse employment decision.  To overcome this showing, Yunckes "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (internal citations and quotations omitted).  The Court's review of the record reveals no such inconsistencies and Yunckes advances no evidence that could enable a reasonable factfinder to infer that the DHS did not act based on its proffered legitimate reason.  Absent a *prima facie* showing of discrimination or some evidence of pretext, summary judgment on the disparate treatment claim in favor of the employer is appropriate.

### B. Failure to Accommodate

The Rehabilitation Act creates a claim on behalf of an "otherwise qualified individual with a disability" where an employer refuses to provide reasonable accommodation to that disabled individual. Shiring v. Runyon, 90 F.3d 827, 832 (3d Cir. 1996).  The elements of a *prima facie* showing for a failure to accommodate claim are the same as for a disparate treatment claim, with the exception of the additional burden on the plaintiff to make a showing that reasonable accommodation is possible and the employer failed to provide accommodation.  The burden shifting paradigm established in McDonnell Douglas also applies to Yunckes' failure to accommodate claim, and the burden on him to demonstrate that he was disabled during the period of his employment with the DHS is the same.  Thus, the reasoning relied upon by the Court in granting the defendant's motion for summary

judgment on the disparate treatment claim applies with equal force to the failure to accommodate claim. Yunckes failed to demonstrate that the impairment he suffered constitutes a disability within the meaning of the Act. Absent a *prima facie* showing of discrimination, summary judgment on the failure to accommodate claim in favor of the employer is appropriate.

## V. CONCLUSION

Under the McDonnell Douglas framework, summary judgment is appropriate where a defendant demonstrates that the plaintiff is unable to establish a *prima facie* case of discrimination, or, if the plaintiff has established a prima facie case, that the plaintiff could not produce sufficient evidence of pretext to rebut an assertion of legitimate nondiscriminatory reasons for the adverse employment action. Because the DHS has demonstrated that Yunckes failed to establish a *prima facie* case of discrimination and offered clear documentary evidence of a legitimate, nondiscriminatory reason for Yunckes' termination, it is entitled to judgment as a matter of law. Defendant's motion for summary judgment is **granted**. An appropriate order will be entered.

Dated: 2/29/08                                         /s/Katharine S. Hayden

                                                        Katharine S. Hayden, U.S.D.J.